## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

JIMMIE CRAIG HUDSON
CARLA HUDSON

        Debtors

JULIE MINCEY, INDIVIDUALLY AND AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF MARCUS PATY PERKINS

        Plaintiff

        v.

JIMMIE CRAIG HUDSON and
CARLA HUDSON

        Defendants

Case No. 3:24-bk-30745-SHB
Chapter 7

Adv. Proc. No. 3:24-ap-03020-SHB

## M E M O R A N D U M

**APPEARANCES:**    DANIEL KIDD, ESQ.
        1308 Wilson Road
        Suite 102
        Knoxville, Tennessee  37912
        Attorney for Plaintiff

        JIMMIE CRAIG HUDSON
        CARLA HUDSON
        Post Office Box 111
        Norris, Tennessee  37828
        *Pro se* Defendants

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding was initiated by the Complaint to Determine Dischargeability of Debt(s) Owed to Julie Mincey, Individually and as Personal Representative of the Estate of Marcus Paty Perkins ("Complaint") filed on August 8, 2024 [Doc. 1], raising claims under 11 U.S.C. § 523(a)(2)(A), (4), and/or (6).  Defendants, who have appeared *pro se*, filed a handwritten answer "strongly den[ying] all allegations of said theft and other wrong doings[.]" [Doc. 21.]

The trial of this adversary proceeding was held on September 29 and 30, 2025.  The trial record consists of the Joint Stipulations of Undisputed Facts ("Stipulated Facts") included in the Pre-Trial Statement of Joint Stipulations and Issues to be Addressed ("Joint Pre-Trial Statement") filed on September 11, 2025 [Doc. 48]; twenty-nine exhibits entered into evidence;[1] and the testimony of Ellen LaRue, Terrell Mitchell, Plaintiff, and both Defendants.[2]  As stated in the Joint Pre-Trial Statement, the issues before the Court are as follows:

> 1. Did the Debtors obtain money, vehicles, tools and other personal property from the decedent, Marcus Perkins [("Mr. Perkins")], through the use of undue influence, conversion and/or fraud in the days and weeks prior to Mr. Perkins' death?

> 2. Did the Debtors take possession of and remove other personal property from the decedent's home after he died which have not been turned over to the Personal Representative for the Estate of the decedent?

> 3. Were any of the alleged gifts or transfers from the Decedent to the Debtors obtained by false pretenses, fraud or actual fraud?

> 4. Do the actions of the Debtors constitute willful or malicious injury to the property of another?

> 5. Did the Plaintiff suffer damages as a result of the actions of the Debtors, and if yes, in what amount?

---

[1] The Court also takes judicial notice, pursuant to Federal Rule of Evidence 201, of all documents of record in Defendants' underlying bankruptcy case.  References to documents from the bankruptcy case will be [Bankr. Doc. _].

[2] All references to Craig Hudson and Carla Hudson together will be "Defendants." All references to each Defendant individually will be "Mr. Hudson" and "Mrs. Hudson."

6. If a judgment is awarded to the Plaintiff, is the Judgment non-dischargeable under 11 U.S.C. § 523(a)(2)[,] (4)[,] or (6)?

7. Is the Plaintiff entitled to her reasonable attorney fees in prosecuting this action and if yes, in what amount?

[8]. Did the plaintiff take possession of items of personal property (specifically, but not limited to, a boat, motor trailer, .38 revolver, Knife and rings, etc.) from the Decedent's house before or after he died, or did she allow others to take possession of personal property from the decedent's house before or after he died, and if yes, are the Defendants entitled to an offset against the Plaintiff for the value of those items?[3]

[Doc. 48 at 4-5.]

This Memorandum constitutes findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## I.  FINDINGS OF FACT[4]

### A. The Perkins Family

Plaintiff is the daughter of Nancy Perkins ("Mrs. Perkins"), who was married to Mr. Perkins, who was Mrs. Hudson's father, making Plaintiff and Mrs. Hudson stepsisters. [Stip. Facts at ¶¶ 5, 7.]  In July 2018, Mr. Perkins executed a Last Will and Testament ("2018 Will"[5])

---

[3] Because Defendants did not properly raise offset as an affirmative defense, the Court deems it waived.  Similarly, the seven additional issues stated by Defendants in their Statement of Issues filed on September 15, 2025 [Doc. 52], are deemed waived.

[4] The facts are derived from the Stipulated Facts [Doc. 48 at 1-4], testimony of the witnesses at trial, and the trial exhibits introduced into evidence, including the Transcript attached as Exhibit 1 to the Master's Report [Ex. 8 Ex. 1]. All record citations to the Stipulated Facts will be "Stip. Facts at ¶ _."  All record citations to the Transcript attached to the Master's Report will be "Tr. at _:_ (page and line)."  All references to other trial exhibits will be to the exhibit number and, if applicable, the page number.  Additionally, because "[t]his dischargeability action is not a civil action grounded by state law[, but instead] . . . concerns an issue of federal bankruptcy law, [i.e.,] the discharge of a debt under bankruptcy code standards," Tennessee Code Annotated section 24-1-203 (Tennessee's Dead Man's Statute) is inapplicable to this adversary proceeding and does not limit the Court's application of the Federal Rules of Evidence concerning hearsay. *Silver-Hacker v. Allen* (*In re Allen*), 653 B.R. 895, 901 (Bankr. N.D. Ill. 2023); *see, e.g., In re Johns*, No. 21-60010-rlj7, 2023 WL 5124851, at *3 (Bankr. N.D. Tex. Aug. 9, 2023) ("The [state] rules on witness competency do not apply because state law does not supply the rule of decision.").

[5] The 2018 Will superseded a will executed by Mr. Perkins in August 2016, naming Mrs. Perkins as beneficiary of his estate and, if she predeceased him, Mrs. Hudson, Plaintiff, and his other stepdaughter, Angel Knight ("Ms. Knight"), as equal one-third beneficiaries of his real and personal property not otherwise expressly bequeathed within the

naming Mrs. Perkins as beneficiary of his estate and, in the event she predeceased him, naming

Plaintiff and her then-husband as beneficiaries of his real and personal property not otherwise

expressly bequeathed within the document. [Ex. 2 at ¶ 3; Stip. Facts at ¶ 3.]  The 2018 Will

appointed Mrs. Hudson and Plaintiff as co-executrix of his estate. [Ex. 2 at ¶ 7.]  Additionally, as

reflected in the Consumer Credit Union Loanliner Account Card Application dated February 8,

2021, Plaintiff was designated by Mr. Perkins as Beneficiary/Payable-on-Death Payee on all of

his accounts with the Credit Union.[6] [Ex. 34.]

Mrs. Perkins passed away on January 31, 2021, and Mr. Perkins's son, Malcolm, died in

April 2021. [Stip. Facts at ¶¶ 4, 8.]  Malcolm lived with Mr. Perkins at some point between

October 2020 and his death in April 2021.  In the spring of 2021, Mr. Perkins, who was suffering

from cancer, stopped treatments, and Defendants moved into his home at 5122 Carter Road,

Knoxville, Tennessee, on April 13, 2021, to become his primary caretakers as his health

declined. [Tr. 9:6-7, 13:24-14:2; Stip. Facts at ¶¶ 9-11.]

In late September 2021, Mr. Perkins was placed on hospice care and first visited by a

nurse from UT Hospital on September 20, 2021. [Ex. 11; Ex. 12; Tr. at 7:19-22; Stip. Facts at ¶¶

17-18.]  Mrs. Hudson signed the hospice forms in her capacity as Mr. Perkins's daughter,

primary caregiver, and representative. [Ex. 11.]  Pursuant to the Visit Note Report made by the

hospice nurse, Mr. Perkins was "alert" and oriented to person, place, and time; however, the visit

notes were electronically signed by Mrs. Hudson because Mr. Perkins was "unable to sign." [Ex.

12 at 6, 12.]

---

document. [Ex. 1 at ¶ 3; Stip. Facts at ¶ 2.]  The earlier will also appointed Mrs. Hudson and Plaintiff as co-executrix
of his estate. [Ex. 1 at ¶ 7.]

[6] Plaintiff testified that she was the payable-on-death beneficiary of only the savings account, but the Credit Union's
records show otherwise.

Mr. Perkins suffered a stroke on October 24, 2021, and was transported to the hospital

where he remained until October 26, 2021, when he returned to his home by ambulance. [Stip.

Facts at ¶¶ 32-33.]  Mr. Perkins passed away two days later, on October 28, 2021. [Tr. at 7:23-

24; Stip. Facts at ¶ 1.]

### B. Documents and Transactions

On April 23, 2021, Mr. Perkins signed a document appointing Mrs. Hudson as his power

of attorney. [Tr. 9:8-10.[7]  After they moved into Mr. Perkins's home, and until his death, Mr.

Hudson regularly used the debit card associated with Mr. Perkins's checking account for

groceries, restaurants, tobacco, and other items, often as requested by Mr. Perkins.

Three days after the first hospice visit to Mr. Perkins's home, on September 23, 2021,

Mr. Perkins signed the following documents:

- a Tennessee General Power of Attorney designating Mrs. Hudson as his attorney-
in-fact and authorizing her to perform the following on his behalf: (1) make payments or

collect monies; (2) acquire, lease, and sell both real and personal property; (3) manage,

repair, improve, invest, maintain, insure, rent, and encumber real and personal property;

(4) enter into contracts; (5) make health care decisions as his HIPAA personal

representative; (6) hire and pay for professionals, including attorneys and accountants; (7)

reimburse herself for reasonable expenses incurred in her capacity as attorney-in-fact;

and (8) file suit against any third party refusing to transact with and/or recognize her as

attorney-in-fact and

- a General Power of Attorney naming Mrs. Hudson as his attorney-in-fact with

respect to the following types of transactions and matters: (1) real property and lease; (2)

---

[7] This document was not introduced into evidence at the trial.

personal property; (3) banking and financial; (4) estate; (5) contractual; (6) insurance; (7)

medical; (8) legal; (9) social security; (10) tax; (11) employment of agent and service

professionals; and (12) personal relationships and affairs.

[Ex. 13.[8]]  Also on September 23, 2021, Mr. Perkins executed two versions of a Last Will and

Testament ("2021 Will"), which contain identical provisions naming Mrs. Hudson as the sole

beneficiary of his real and personal property and appointing her as executor of his estate.[9] [Ex. 3;

Ex. 4.[10]]  On the same day, Mr. Perkins also gifted a Polaris 4-wheeler ("ATV") to Mrs. Hudson,

as reflected by his handwritten notations on the Cover Page to the Cub Cadet Parts Manual RZT

Series Tractor Model Number TZT 50.  That Cover Page also reflects that Mr. Perkins gifted a

Cub Cadet lawnmower ("Cub Cadet") to Mr. Hudson on the same day. [Ex. 5; Stip. Facts ¶¶ 26-

28.]

On October 1, 2021, Mr. Perkins signed an Affidavit of Non-Dealer Transfers of Motor

Vehicles and Boats ("Vehicle Affidavit"), gifting a 1981 Chevrolet Blazer ("Blazer") to Mrs.

Hudson. [Ex. 14; Stip. Facts at ¶ 30.]  That same day, he signed a Tennessee Department of

Revenue Power of Attorney for Vehicle Transactions ("Vehicle POA"), appointing Mr. Hudson

as attorney-in-fact representative for the purpose of obtaining a duplicate title to the Blazer. [Ex.

14.] Mrs. Hudson signed the same document on October 27, 2021, appointing Mr. Hudson as

---

[8] The Court will collectively reference these documents as "Powers of Attorney."

[9] On September 23, 2021, Mr. Hudson also destroyed the 2018 Will in the presence of Terrell Mitchell. [Tr. at 10:10-11, 15-17; Stip. Facts at ¶¶ 25, 29.]

[10] Terrell Mitchell, who is not an attorney, prepared the documents that were signed by Mr. Perkins on September 23, 2021, but he was not present when they were signed by Mr. Perkins.  Mr. Mitchell often printed documents for Mr. Hudson. [Tr. at 9:3-5, 21-23; Stip. Facts at ¶¶ 19-20.]  Trial Exhibit 3 is the 2021 Will with only the signature of Mr. Perkins and the notary.  Trial Exhibit 4 is the 2021 Will reflecting the signatures of Mr. Perkins, the notary, and Mr. Mitchell under the word "Witness," although he testified that he was not a witness to Mr. Perkins's signature and intended only to "witness" that he had printed the document.

attorney in fact for a vehicle information request, application and title registration, and transfer of

title to the Blazer. [Ex. 14; Stip. Facts at ¶ 31.]  Also on October 27, 2021, the State of Tennessee

issued a title to Mr. Hudson for a 2000 Chevrolet Silverado ("Silverado"), which previously had

been owned by Mr. Perkins "for years," according to Plaintiff.[11] [Ex. 24.]

Defendants also used Mr. Perkins's debit card to pay $741.47 for tires that were

purchased through eBay on October 27, 2021. [Ex. 7 at 2 No. 1; Ex. 17; Stip. Facts at ¶¶ 12, 35.]

Additionally, Mr. Hudson wrote two checks from Mr. Perkins's bank account; specifically, he

used check numbers 3030 and 3037 to pay the $200.00 monthly rental fee for a storage unit at

Hickory Hollow Rentals in July and August 2021, by signing Mr. Perkins's name as payor. [Stip.

Facts at ¶¶ 13-16.]  Mr. Perkins, himself, wrote other checks in August, September, and October

2021, including check number 3050, which was dated November 11, 2021, and payable to Mrs.

Hudson in the amount of $28,900.00. [Ex. 15; Stip. Facts at ¶ 34.]  Mrs. Hudson endorsed the

check, which Mr. Hudson deposited into her bank account on October 26, 2021. [Ex. 15 at 5.]

After Mr. Perkins's death, Mrs. Hudson continued to pay his outstanding bills, stopped

automatic payments, planned the funeral, and communicated his death to the Social Security

Administration.  She also made a payment to the funeral home and to the Knox County Trustee

for property taxes. [Ex. 7 at 3 (Interrog. No. 4).]  Defendants continued living in Mr. Perkins's

home until July 2022 after Ms. Knight purchased the house by paying Plaintiff and Mrs.

Hudson.[12]  After Mr. Perkins's funeral, Plaintiff and Mrs. Hudson each agreed for the other to

---

[11] In addition to Stipulated Fact 36, the evidence in the record concerning this vehicle is Mrs. Hudson's testimony that she did not know the details of Mr. Perkins's gifting it to Mr. Hudson; Mrs. Hudson's response to Interrogatory No. 1 that Mr. Perkins had gifted the vehicle and they had sold it [Ex. 7 at 1 No. 1]; Mr. Hudson's testimony that one of the two payments to the Knox County Clerk on October 21, 2021, was for the title to the Silverado; and the Certificate of Title issued on October 27, 2021, reflecting Mr. Hudson as owner of a Silverado and handwritten Bill of Sale that it was sold on July 5, 2022, with no sales price reflected. [Ex. 24.]

[12] Plaintiff clearly testified that Ms. Knight purchased Plaintiff's and Mrs. Hudson's interests in the house even though the 2018 Will clearly bequeathed all real property to Plaintiff and her then-husband. [Ex. 2 ¶ 3.]

take a ring that Mr. Perkins had been wearing.  In November 2021, Plaintiff closed Mr. Perkins's

bank account, which had a balance of $3,491.72. [Ex. 33.]

As of the trial date in this adversary proceeding, Defendants remained in possession of a

revolver and a shotgun that belonged to Mr. Perkins.[13] [Stip. Facts at ¶ 39.]  Although

Defendants sold the Blazer and Silverado in July 2022, they still possess the ATV and Cub

Cadet, which they store at Mr. Mitchell's residence. [Stip. Facts at ¶¶ 36, 40.]

### C. The Probate Case

On January 10, 2022, Plaintiff petitioned the Knox County Probate Court for Letters of

Administration through *In re Estate of Marcus Paty Perkins*, Case No. 85494-2, Knox County

Chancery Court, Probate Division ("Probate Case"), as amended on July 28, 2022, seeking to

administer Mr. Perkins's estate and to probate the 2018 Will. [Tr. 4:15-22.]  After a hearing

conducted on August 22, 2023, which included the testimony of five witnesses and submission

of fourteen exhibits, the Clerk and Master, J. Scott Griswold ("Clerk and Master"), gave his

findings orally from the bench on September 8, 2023. [Ex. 8; Stip. Facts at ¶ 37.]  As stated by

the Clerk and Master, "[t]he central issue that was heard on August 22, 2023, was whether or not

a copy of [the 2018 Will] should be admitted into probate." [Tr. at 4:23-5:2.]

The Clerk and Master filed the Master's Report on October 23, 2023, incorporating his

findings and recommendations announced orally on September 8. [Ex. 8.[14]]  After finding that

the 2021 Will, although notarized, did not comply with the statutory requirements for a valid,

---

[13] When asked by the Court why he had not turned over the guns, Mr. Hudson stated that he had not been asked to but that he was in no way claiming any ownership of them and was prepared to turn them over without this Court requiring him to do so.

[14] The transcript of his oral findings given on September 8 states that stipulated facts would be attached to his report "such that it becomes an official part of the record," and the Master's Report likewise references that the joint stipulations were attached as Exhibit 2; however, the Master's Report entered into evidence as Trial Exhibit 8 does not include any such attachment.

non-holographic will under Tennessee law because it lacked the signatures of two attesting

witnesses [Tr. at 8:4-11], the Clerk and Master granted Plaintiff's petition and admitted the 2018

Will to probate. [Ex. 8.]  The Master's Report also named Plaintiff as the sole executrix of Mr.

Perkins's estate, required her to post a $100,000.00 administrator's bond, required her to file an

inventory within sixty days, directed her to file periodic accountings, and authorized her to

investigate and pursue transactions between Mr. Perkins and Defendants. [Ex. 8 at ¶¶ 3-4; *see

also* Tr. 14:21-15:7.]

Specifically, the Clerk and Master found that Mr. Perkins had been "very sick and that he

was on a number of medications, including morphine, . . . [but that] the proof did show that he

would've been competent to execute a document on September 23, 2021, given that it is an

incredibly low threshold." [Tr. at 12:4-10.]  He also concluded that Plaintiff "met her burden of

proof by clear and convincing evidence to overcome the presumption that [Mr. Perkins] revoked

the [2018 Will] in compliance with Tennessee Code Annotated Section 32-1-201, Subpart 3[15]."

[Tr. at 14:8-12.]  On the question of whether Defendants had engaged in undue influence as

alleged by Plaintiff, the Clerk and Master found that circumstantial evidence – including the

close relationship between Mrs. Hudson and Mr. Perkins, the "secrecy in which [the September

23] documents were executed," the deviation from prior wills prepared by an attorney, and the

benefits Defendants received through the documents – led him to believe "there was some

influence that precipitated some of these changes." [Tr. at 12:11-18, 13:9-23.]  The Clerk and

Master also found that it was not in the best interest of Mr. Perkins's estate for Mrs. Hudson to

---

[15] Tennessee Code Annotated section 31-1-201(3) provides that a will is revoked by "[b]eing burned, torn, cancelled, obliterated or destroyed, with the intent and for the purpose of revoking it, by the testator or by another person in the testator's presence and by the testator's direction[.]"

be a co-executrix with Plaintiff "in light of the conflicts that have arisen" between Plaintiff and

Mrs. Hudson. [Tr. 14:15-20.][16]

### D. The Bankruptcy Case

Defendants filed the joint Voluntary Petition commencing their Chapter 7 bankruptcy

case on May 2, 2024, and received a discharge on August 14, 2024. [Bankr. Doc. 34.]  They did

not disclose in their Statement of Financial Affairs [Ex. 32] that they are in possession of Mr.

Perkins's guns,[17] nor did they disclose repayment of a personal loan of approximately

$25,000.00 to Mrs. Hudson's son[18] that she paid from a $40,000.00 withdrawal from her bank

account in September 2023. [Ex. 31 at 12.]

## II.  ANALYSIS

The longstanding, primary purpose of bankruptcy in the United States is to offer a fresh

start to "the honest but unfortunate debtor." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934);

*see also Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).  Plaintiff seeks a judgment against

Defendants for actual and punitive damages and a determination that the judgment is

nondischargeable under 11 U.S.C. § 523(a)(2)(A), (4), and/or (6).  Because the fresh start is a

central goal of bankruptcy, the Court construes § 523(a) liberally in favor of Defendants and

---

[16] The Preliminary Statement of the Complaint states that Plaintiff filed a lawsuit against Defendants in Anderson County Chancery Court (Docket No. 24CH5645), alleging that they "obtained money, vehicles, tools and other personal property from the decedent, Marcus Perkins, through the use of undue influence [sic] conversion and fraud in the days and weeks prior to Mr. Perkins' [sic] death and that [Defendants] took possession of and removed other personal property from the decedent's home after he died." [Doc. 1 at ¶ 1.]  No pleadings from the Anderson County Chancery Court lawsuit, however, were introduced into this Court's record.

[17] Mr. Hudson testified that he did not list Mr. Perkins's guns that are in his possession because he does not own them. When asked about the question in the Statement of Financial Affairs concerning property being held for others and who owns the guns, Mr. Hudson answered that he did not know.

[18] Notwithstanding Mrs. Hudson's testimony that she did not know she had to disclose the payment to her son, the Court is concerned that Defendants' Statement of Financial Affairs does not reflect this payment because it might have been recoverable by the Chapter 7 Trustee for the benefit of creditors as a preference payment to an insider under 11 U.S.C. § 547(b).

strictly against Plaintiff, who bears the burden of proving all elements under each subsection by a preponderance of the evidence. *Grogan*, 498 U.S. at 291; *Rembert v. AT&T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

Plaintiff argues that Defendants engaged in undue influence, false pretenses, actual fraud, defalcation, and conversion to obtain vehicles, tools, firearms, an ATV, and money from Mr. Perkins, first, and then from his estate and her, as residual beneficiary under the 2018 Will. Plaintiff asserts that Defendants are estopped[19] from challenging the findings of fact and conclusions of law made by the Clerk and Master in the Probate Case.

## A. Collateral Estoppel

The Sixth Circuit Court of Appeals recently thoroughly explained the concepts of res judicata and collateral estoppel and how they apply or do not apply in bankruptcy nondischargeability actions.

> Res judicata, also known as claim preclusion, "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Brown v. Felsen*, 442 U.S. 127, 131 (1979). This differs from the narrower doctrine of collateral estoppel, also known as issue preclusion, which "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 461 (6th Cir. 1999) (citation omitted). The difference in these two doctrines is critical as applied to dischargeability proceedings in bankruptcy.

> Whether a debt is nondischargeable under 11 U.S.C. § 523(a) is a matter separate from the merits of the debt itself. *Sill v. Sweeney (In re Sweeney)*, 276 B.R. 186, 195–96 (B.A.P. 6th Cir. 2002) (explaining that a dischargeability action encompasses "two distinct claims"—(1) whether a debt is owed, and (2) whether it

---

[19] Plaintiff argues in her brief that "[Defendants] are judicially estopped from challenging the findings and conclusions made by the Clerk and Master in the Probate [C]ase as to many other [facts]. Judicial Estoppel is an extension of the principle of *Res Judicata* and it applies when . . . 'the issue involved in the case under consideration has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment.'" [Doc. 53 at 6 (quoting *Clark v. Sputnicks, LLC*, 368 S.W.3d 431, 437 (Tenn. 2012) (citations omitted)).] Based on the definition cited by Plaintiff, the Court discerns that the reference to "judicial" estoppel should be collateral estoppel. *See Clark*, 368 S.W.3d at 437.

is dischargeable (quoting *Jorge v. Mannie* (*In re Mannie*), 258 B.R. 440, 444-45 (Bankr. N.D. Cal. 2001))). Res judicata applies to the existence of a debt, but not to the question of whether that debt is dischargeable in bankruptcy because dischargeability is a legal conclusion within the exclusive jurisdiction of the bankruptcy courts. *Brown*, 442 U.S. at 136–39. And because the issue of dischargeability cannot be litigated in a state court, the affirmative defense of res judicata is not available to [a creditor] in the context of [a bankruptcy] case.

> Principles of collateral estoppel, on the other hand, do apply to the determination of dischargeability. *Grogan*, 498 U.S. at 284 n.11. So, when the debt at issue is based on a state-court judgment, the bankruptcy court's ultimate dischargeability determination may be governed by factual issues decided by the state court, provided that the requirements of collateral estoppel are met. *Spilman v. Harley*, 656 F.2d 224, 227–28 (6th Cir. 1981) ('[T]hat Congress intended the bankruptcy court to determine the final result [of] dischargeability . . . does not require the bankruptcy court to redetermine all the underlying facts.' When the requirements are met, 'collateral estoppel should preclude relitigation of factual issues.').

*Long v. Piercy* (*In re Piercy*), 21 F.4th 909, 918-19 (6th Cir. 2021).

Thus, when presented with an assertion of collateral estoppel in support of a nondischargeability claim, this Court "must review the record of the state-court proceeding to determine if any factual issues relevant to dischargeability have been actually and necessarily determined by the state court." *Id.* at 919. If a state court would give preclusive effect to a judgment, the federal court must follow suit. *See Migra v. Warren City Sch. Bd. of Educ.*, 465 U.S. 75, 81 (1984).

Under Tennessee law, collateral estoppel requires proof of the following five elements:

> (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding [and was necessary to the judgment], (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded.

*Bowen*, 502 S.W.3d at 107 (quoting *Mullins v. State*, 294 S.W.3d 529, 535 (Tenn. 2009)); *see also In re Piercy*, 21 F.4th at 920.  Tennessee courts recognize both offensive collateral estoppel – when a plaintiff attempts to prevent a defendant from relitigating an issue previously litigated and lost – as well as defensive collateral estoppel – when a defendant seeks to prevent a plaintiff from relitigating an issue previously litigated and lost. *Bowen*, 502 S.W.3d at 107-08.

Here, Plaintiff argues that the Master's Report and the Clerk and Master's associated findings after the hearing, as transcribed, constitute a final judgment that is subject to preclusive effect under Tennessee law because it raises the same issues concerning undue influence and fraud.  The Court disagrees.

Plaintiff's argument fails, first, because a report by a clerk and master is not a final appealable order under Tennessee law.  Secondly, collateral estoppel does not apply because the issue of undue influence was not determined by the Clerk and Master.  The only issue decided by the Clerk and Master was whether the 2018 Will or the 2021 Will should be admitted for probate, and the question of undue influence was neither decided nor necessary to the determination of whether the 2021 Will was valid to be admitted for probate.

First, jurisdiction of probate proceedings is vested by statute with the chancery court. Tenn. Code Ann. § 16-16-201(a).  That statute also states the following about the authority of a chancery court's clerk and master, subject to the final approval of the chancellor:

> The clerk and master in such counties shall be authorized and empowered to grant letters of administration and letters testamentary, letters of guardianship and letters of conservatorship, appoint administrators and executors, appoint guardians and conservators, receive and adjudicate all claims, probate wills in common form, determine allowances to the surviving spouse and family of the deceased, preside over the assignment of homestead, preside over proceedings for the elective share, take and state all accounts and settlements, subject to the approval of the chancellor, direct and approve final distributions, and hear and determine all probate matters whether enumerated or not in this subsection (b). The chancellor shall hear all probates in solemn form and may hear such other probate matters as the chancellor

may deem proper. All accounts, settlements and final orders of distribution shall be made subject to the approval of the chancellor. *All action taken by the clerk and master shall be subject to review by the chancellor by simple motion, petition or the filing of exceptions as may be appropriate.*

Tenn. Code Ann. § 16-16-201(b) (emphasis added). This statute is supplemented by Tennessee

Rule of Civil Procedure 53.02, which outlines a clerk and master's authority, and Tennessee

Rule of Civil Procedure 53.04, which details the following regarding a clerk and master's report:

> **(1) Contents and Filing**. The master shall prepare a report upon the matters submitted by the order of reference and, if required to make findings of fact and conclusions of law, the master shall set them forth in the report. The master shall file the report with the clerk of the court and, unless otherwise directed by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits. The clerk shall forthwith mail to all parties notice of the filing.
>
> **(2) In Non-jury Actions**. In an action to be tried without a jury the court shall act upon the report of the master. Within ten (10) days after being served with notice of the filing of the report, any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6.04. The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.
>
> . . . .
>
> **(4) Stipulation as to Findings**. The effect of a master's report is the same whether or not the parties have consented to the reference; but, when the parties stipulate that a master's findings of fact shall be final, only questions of law arising upon the report shall thereafter be considered.
>
> **(5) Draft Report**. Before filing a report a master may submit a draft thereof to counsel for all parties for the purpose of receiving their suggestions.

Tenn. R. Civ. P. 53.04. Finally, subsection (c) of the statute, which states that "[t]he court of appeals shall have jurisdiction of appeals from the decisions of the chancery court in such probate matters," makes it clear that final orders in a probate matter must have been entered by the court, i.e., the chancellor, and a clerk and master's report is not such an order. Tenn. Code Ann. § 16-16-201(c). Because the Master's Report on its face states that it contains "his interim

findings and recommendations" and that he "recommends this Court enter an order," the

Master's Report is not a final order.  Nor is there any evidence in this record that the Master's

Report was adopted through a chancellor's order or that the parties stipulated that the Clerk and

Master's findings of fact were final.  Accordingly, no findings of fact in the Master's Report are

entitled to preclusive effect.[20]

Even if the Master's Report was a final order that could be considered for collateral

estoppel purposes, it does not contain any finding of fact that were necessary to the sole issue of

which will would be accepted for probate that would satisfy the elements of any claim under §

523(a).  Thus, collateral estoppel does not apply, and Plaintiff bore the burden to present

sufficient evidence on each element of her claims.

## B.  Nondischargeability under § 523(a)(2)(A)

Plaintiff first argues that Defendants obtained the vehicles, Cub Cadet, tools, firearms,

and $28,900.00 check to Mrs. Hudson through false pretenses and actual fraud and asks the

Court to find that she is entitled to a monetary judgment and determination under § 523(a)(2)(A)

excepting the judgment from Defendants' discharge "for money . . . to the extent obtained by . . .

false pretenses, . . . or actual fraud." 11 U.S.C. § 523(a)(2)(A).[21]  As explained by Judge Richard

Stair:

> [N]ondischargeability under § 523(a)(2)(A) requires a showing of some conduct by
> the debtor which can be fairly said to be blameworthy.  In other words, the debtor
> must be guilty of positive fraud, or fraud in fact, involving moral turpitude or
> intentional wrong, and not implied fraud, or fraud in law, which may exist without
> the imputation of bad faith or immorality.

---

[20] The Master's Report in the record also is incomplete because it does not attach the "Joint Stipulations and Exhibits"
as Exhibit 2. [*See* Ex. 8; *supra* fn. 16.]

[21] Although not applicable here, nondischargeability under § 523(a)(2)(A) also encompasses false representations for
"statements that falsely purport to depict current or past facts" but is an exclusive cause of action because a false
representation is an *express* misrepresentation." *Fuller v. Givens* (*In re Givens*), 634 B.R. 755, 762 (Bankr. E.D. Tenn.
2021).

*Haney v. Copeland* (*In re Copeland*), 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003) (citation

modified).  False pretenses and actual fraud are "separate yet related concepts that share common

elements needed to prove nondischargeability." *Rable v. Childers* (*In re Childers*), 651 B.R. 699,

718 (Bankr. N.D. Ohio 2023).

Actual fraud under § 523(a)(2)(A) "denotes any fraud that 'involves moral turpitude or

intentional wrong.'" *Husky Int'l. Elecs, Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (citation modified).

As stated by the Bankruptcy Appellate Panel for the Sixth Circuit:

> Fraud is a generic term, which embraces all the multifarious means which human
> ingenuity can devise and which are resorted to by one individual to gain an
> advantage over another by false suggestions or by the suppression of truth. No
> definite and invariable rule can be laid down as a general proposition defining
> fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way
> by which another is cheated. . . . Actual fraud has been defined as intentional fraud,
> consisting in deception intentionally practiced to induce another to part with
> property or to surrender some legal right, and which accomplishes the end designed.
> It requires intent to deceive or defraud.

*Mellon Bank, N.A. v. Vitanovich* (*In re Vitanovich*), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001)

(citations omitted).  Actual fraud may include misrepresentations but also "encompasses forms

of fraud, like fraudulent conveyance schemes, that can be effected without a false

representation." *Husky Int'l. Elecs.*, 578 U.S. at 359.

False pretenses under § 523(a)(2)(A) means "conscious deceptive or misleading conduct

calculated to obtain, or deprive, another of property [and] includes any 'scam, scheme,

subterfuge, artifice, deceit, or chicanery in the accomplishment of an unlawful objective' by the

defendant." *Giglio v. Nisivoccia* (*In re Nisivoccia*), 502 B.R. 139, 155 (Bankr. E.D.N.Y. 2013)

(citations omitted). "The implication arises when a debtor, with the intent to mislead a creditor,

engages in a series of events, activities or communications which, when considered collectively,

create a false and misleading set of circumstances, or understanding of a transaction, in which

the creditor is wrongfully induced by the debtor to transfer property[.]" *Ill. Dep't of Emp. Sec. v. Davis* (*In re Davis*), 668 B.R. 580, 599 (Bankr. N.D. Ill. 2025) (citation modified).  In other words, false pretenses are "'implied misrepresentations or conduct intended to create or foster a false impression,' [are] established or fostered willfully, knowingly and by design[, and are] not the result of inadvertence. [They] do not require overt misrepresentations, but the debtor must know that he is creating a false impression upon the plaintiff." *Robb v. Givden* (*In re Givden*), 667 B.R. 171, 181 (Bankr. N.D. Ga. 2025) (internal citations omitted).  Additionally, as with actual fraud, creditors seeking redress for false pretenses under § 523(a)(2)(A) must demonstrate justifiable reliance and the debtor's specific intent to mislead, trick, or cheat, *City Bank & Tr. Co. v. Vann (In re Vann)*, 67 F.3d 277, 283-84 (11th Cir. 1995). A court's determination of intent often requires an in-person assessment of the debtor's credibility and demeanor. *In re Givden*, 667 B.R. at 181-82.

Therefore, to prove that Defendants obtained money and property from Mr. Perkins or Plaintiff (as his residual beneficiary under the 2018 Will) through false pretenses, Plaintiff must satisfy the following elements:  (1) Defendants obtained money through an implied misrepresentation that they knew at that time was false or was made with gross recklessness as to its truth; (2) Defendants intended to deceive Mr. Perkins and/or Plaintiff; (3) Mr. Perkins and/or Plaintiff justifiably relied on the false representation; and (4) such reliance was the proximate cause of any loss. *See In re Rembert*, 141 F.3d at 280–81.  The "[f]ailure to prove a single element requires a finding of dischargeability." *Signal Asset Mgmt. v. Rodriguez (In re Rodriguez)*, No. 19-81378-CRJ-7, A.P. No. 19-80063-CRJ-7, 2021 WL 1219512, at *8 (Bankr. N.D. Ala. Mar. 30, 2021).

For either false pretenses or actual fraud, fraudulent intent may be inferred "based on 'circumstantial evidence or by inferences drawn from a course of conduct or from the totality of the circumstances.'" *Rael v. Gonzales* (*In re Gonzales*), 667 B.R. 357, 369 (Bankr. D.N.M. 2025) (citations omitted). Such proof, however, must show "an actual intent to mislead, which is more than mere negligence" or even recklessness. *In re Copeland*, 291 B.R. at 766 (citations omitted); *see also Sequatchie Mtn. Creditors v. Lile*, 585 B.R. 426, 439 (N.D. Ohio 2018) ("Having conducted a de novo review, the Court finds that the bankruptcy court did not err by ruling that gross recklessness is not the standard (or substitute) for fraudulent intent under § 523(a)(2)(A)."). "[W]hile recklessness may be a sufficient basis to infer knowledge, it does not, without more, demonstrate a deliberate intention to cheat or mislead." *Jam 42nd St. Realty LLC v. Mavrelis* (*In re Mavrelis*), Adv. Proc. No. 19-01014-ess, 2020 WL 5883405, at *11 (Bankr. E.D.N.Y. Oct. 1, 2020) (citation omitted)).

"Absent direct evidence of fraudulent intent, the court must determine whether fraudulent intent may be 'inferred as a matter of fact' based on a totality of the circumstances when a defendant has engaged in 'blameworthy' conduct." *Long v. Piercy* (*In re Piercy*), Consol. A.P. No. 3:18-ap-3043-SHB, 2023 WL 2227563, at *6 (Bankr. E.D. Tenn. Feb. 24, 2023) (quoting *In re Copeland*, 291 B.R. at 759). "[C]redibility and intent are questions of fact that must be resolved by observing a witness's demeanor and presence on the stand." *Kloeber v. Montanari* (*In re Montanari*), No. 12-33189, 2015 WL 603874, at *8 (Bankr. E.D. Tenn. Feb. 12, 2015); *see also Estate of Cora v. Jahrling* (*In re Jahrling*), 816 F.3d 921, 926 (7th Cir. 2016) (finding that the bankruptcy court did not err when it based its findings about the debtor's state of mind on circumstantial evidence and drew inferences "based on the objective circumstances, but . . . applied the correct subjective standard"); *Nev. Prop. 1 LLC v. D'Amico* (*In re D'Amico*), 509

B.R. 550, 557 (S.D. Tex. 2014) ("The debtor's subjective motive to cause harm, however, is a

question of fact[.]"); *Ross v. Cecil Cnty. Dep't of Social Servs.,* 878 F. Supp. 2d 606, 621 n.26

(D. Md. 2012) ("Resolution of questions of intent often depends upon the credibility of the

witnesses, which can best be determined by the trier of facts after observation of the demeanor of

the witnesses during direct and cross examination." (citation omitted)); *Cocke Cnty. Bd. of

Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W. 2d 231, 235 (Tenn. 1985) (holding that

finders of fact "may place whatever weight they choose upon such testimony and may reject it, if

they find that it is inconsistent with the facts in the case or otherwise unreasonable." (quoting 31

Am. Jur. 2d Expert and Opinion Evidence § 138 (1967)).

Plaintiff included allegations in her Complaint that Defendants exercised undue influence

over Mr. Perkins surrounding execution of the 2021 Will and the personal property that he gifted

to them; that they spent money belonging to Mr. Perkins, including the $28,900.00 check to Mrs.

Hudson and their unauthorized use of his debit card; and that they took personal property from

Mr. Perkins's home after his death. [*See* Doc. 1 at ¶¶ 13-22, 24, 29, 31-32, 35.]  Similarly, in her

brief, Plaintiff argued that Defendants "(ab)used" Mr. Perkins by using his debit card and

checking account during the time they lived with him. [*See* Doc. 53 at 7, 11.]  And at trial,

Plaintiff testified specifically that Defendants exercised undue influence over Mr. Perkins and

defrauded both him and her, as residual beneficiary to his estate, through the following actions:

- Mr. Hudson wrote two checks on Mr. Perkins's bank account to pay for his

storage unit in July and August 2021, even though Mr. Hudson had sufficient funds to pay

the rent out of his own account.

- Mrs. Hudson did not tell Plaintiff about the 2021 Will or the Powers of Attorney

executed by Mr. Perkins in October 2021.

- Defendants used Mr. Perkins's debit card to buy groceries, tobacco, and alcohol while living with Mr. Perkins even though Mr. Perkins had told Plaintiff that he was no longer using tobacco or alcohol.

- The $28,900.00 check to Mrs. Hudson was dated November 11, 2021, but deposited on October 26, 2021.[22]

- Defendants obtained title to the ATV, Blazer, and Cub Cadet through undue influence and fraud.

- Defendants took guns, tools, welders, weed-eaters, clothing, and vehicles that had belonged to Mr. Perkins's estate and sold or kept them for their own use.

As an initial matter, the Court found the witnesses who testified to be credible. From that testimony, clearly the parties loved Mr. Perkins. Also clear is that the parties view the same facts through very different lenses, with both viewpoints having plausibility. Nevertheless, the Court must make its determination based on the record before it, and a finding of nondischargeability under § 523(a)(2)(A) requires Plaintiff to establish that Defendants' actions were fraudulent and part of a scheme in which they conspired to deprive Mr. Perkins – and thus, his estate and Plaintiff individually – out of the rightful ownership of the property. Based on the record, including the witnesses' testimony at trial and the exhibits, the Court finds that Plaintiff has failed to meet her burden of proof by a preponderance of the evidence that Defendants obtained money or property from either Mr. Perkins or his estate through false pretenses or actual fraud.

---

[22] Plaintiff testified that Mr. Perkins made her the payee-on-death beneficiary for his savings account so that she would have money to pay off her house and remove her ex-husband as an owner. The check deposited by Mrs. Hudson resulted in an overdraft transfer from the savings account to the checking account of $26,160.85, which reduced the balance in the savings account to $3,875.48.

First, several of Plaintiff's allegations are based on pure conjecture.  As her testimony related to Defendants' use of Mr. Perkins's bank account, Plaintiff acknowledged that except for the two checks in July and August written by Mr. Hudson for his storage unit, all other checks were written and signed by Mr. Perkins,[23] including the $28,900.00 check payable to Mrs. Hudson.  Plaintiff also offered no proof to support her allegations that Defendants used Mr. Perkins's debit card without his authority and to his detriment.  At trial, although given the opportunity to do so, Plaintiff did not refute any testimony by Defendants, including Mr. Hudson's testimony that Mr. Perkins often offered use of the debit card to Defendants and that Mr. Hudson had never used the debit card without Mr. Perkins's authorization.

When questioned specifically about the individual debit charges reflected in Mr. Perkins's bank records, a number of which were repetitive, Mr. Hudson testified that Mr. Perkins had insisted that Defendants use his debit card for household items, that most of the charges were for food items that they all ate, for gas and other automotive and household needs, and for tobacco and alcohol that Mr. Perkins had continued to use notwithstanding his representations to Plaintiff to the contrary.  Mr. Hudson also testified that he did not recognize several of the charges and did not know who else may have had access to Mr. Perkins's debit card and account. Concerning the $741.47 eBay tire purchase, both Defendants testified that Mr. Perkins wanted to buy tires for Mr. Hudson's truck.  Notably, Mr. Hudson also testified that he discussed both the debit card use and the eBay purchase with Plaintiff, who did not object and, in fact, declined two offers by Mr. Hudson to repay Mr. Perkins for the tires.[24]  Mr. Hudson further testified that Mr. Perkins called his bank every morning to check the balance.  In summary, other than the

---

[23] Plaintiff acknowledged at trial that the checks were in Mr. Perkins's handwriting.

[24] Plaintiff did not dispute Mr. Hudson's testimony about her statements.

Transcript from the Clerk and Master that alludes to the possibility of undue influence, the record

is devoid of any evidence that Defendants made any misrepresentations to Mr. Perkins intending

to deceive him or that Mr. Perkins justifiably relied on any such misrepresentations.

Second, the record reflects that Mr. Perkins gifted the ATV, Cub Cadet, and Blazer to

Defendants. Each of the documents doing so includes his signature.  The 2018 Will expressly

leaves "[t]he ATV, tools, all firearms, the 1981 Chevy Blazer, boat, motor & trailer and all of my

jewelry to my son Malcolm Perkins." [Ex. 2 at ¶ 5.g.[25]]  The 2018 Will also includes a provision

in the same "Specific Bequests" section leaving "any furnishing or personal item not already

designated for someone else to my daughter Carla Hudson and my step-daughter, [Plaintiff]."

[Ex. 2 at ¶ 5.f.]  Finally, the 2018 Will further bequeathed "[a]ny tools not wanted by my son

Malcom Perkins to be divided equally among my son-in-laws [sic] Craig Hudson and Carlton

Turgeon ["Mr. Turgeon"]." [Ex. 2 at ¶¶ 5.g and h.]

Malcolm Perkins, however, died in April 2021, approximately six months before Mr.

Perkins gifted the items to Defendants.  Further, Mr. Turgeon and Plaintiff were divorced when

Mr. Perkins gifted the items to Defendants.  At that time, Defendants had been living with Mr.

Perkins for several months and, as Plaintiff acknowledged at trial, they had taken care of Mr.

Perkins, cooked for him, and ensured that he took his medications.  Additionally, Plaintiff

testified that between the time her mother passed away on January 31, 2021, and when Mr.

Perkins died on October 28, 2021, she only visited him about six times because, as a certified

nursing assistant, she was concerned about COVID but that she lived close enough to Mr.

Perkins that she could see the backyard and carport from her house.  Plaintiff and Mrs. Hudson

"talked daily" during that time.  However, outside of the six or so times she visited in 2021,

---

[25] The 2016 Will includes the same bequeath. [Ex. 1 at ¶ 5.g.]

Plaintiff did not interact in person directly with Mr. Perkins, so she could not have known his day-to-day activities.[26]

Additionally, Plaintiff did not testify that she observed anything particularly concerning or abnormal about Mr. Perkins outside of his deteriorating health from cancer when she did visit him. She testified that Mr. Perkins stopped leaving the house in August or September and when she visited him in September, he was coughing a lot, was unable to catch his breath, and had morphine beside his recliner. She also testified that when she saw Mr. Perkins in October for his birthday, he sat in his recliner the entire time but the family had cake and pizza, which the parties acknowledged were paid for by Mr. Perkins from his bank account.

Given the evidence presented at trial, the Court finds credible Defendants' assertion that Mr. Perkins wanted to "take care of" them in exchange for their having provided him with care, which explains his gifting of personal property to them, including paying the fees for transferring ownership to the Knox County Clerk.[27] The same can be said for the $28,900.00 check that he wrote to Mrs. Hudson. Mr. Hudson testified that he witnessed Mr. Perkins write out the check, which Mr. Hudson kept until the night Mr. Perkins had his stroke, when he took the check to Mrs. Hudson to sign and then deposited it into her bank account, based on Mr. Perkins's wishes. On cross examination, when questioned about the November 11 date on the check, Mrs. Hudson

---

[26] For example, Plaintiff testified that Mr. Perkins had told her that he stopped using tobacco and drinking beer during 2021 and that he no longer ate regular meals and only drank Ensure, but Defendants' testimony, supported by Mr. Perkins's bank records, evidences otherwise.

[27] Without making any findings about the 2021 Will, the Court notes that the record reflects that Mr. Perkins had, in the past, changed his mind about to whom he wanted to leave his property. Comparing the 2016 Will to the 2018 Will, he changed his mind about dividing the proceeds from a sale of his real property and his personal property in equal one-thirds between Mrs. Hudson, Plaintiff, and Ms. Knight if Mrs. Perkins predeceased him. [*Compare* Ex. 1 at ¶ 3 *with* Ex. 2 at ¶ 3 (leaving his real and personal property to Plaintiff and her then-husband, Mr. Turgeon).] Similarly, he changed the specific devise of a television and stand to Ms. Knight in the 2016 Will to a devise of $1.00 in the 2018 Will [*compare* Ex. 1 at ¶ 5.d *with* Ex. 2 at ¶ 5.d], and of furnishings and personal items not previously designated for someone else to Mrs. Hudson in the 2016 Will to devising those items to Mrs. Hudson and Plaintiff in the 2018 Will. [*Compare* Ex. 1 at ¶ 5.f *with* Ex. 2 at ¶ 5.f.]

testified that she saw a checkbook registry that included three checks dated November 11, and

she presumed that Mr. Perkins had likely meant to date the checks October 11; however, she

does not have or know what happened to the checkbook registry.

That Mr. Perkins did not have sufficient funds in his checking account to cover the check

such that his overdraft protection moved money from his savings account is not proof that Mrs.

Hudson engaged in a fraudulent scheme to take the money from him or from Plaintiff.  The

record is devoid of any evidence tending to show that either Defendant knew that there were

insufficient funds in the checking account when Mrs. Hudson endorsed the check for deposit or

that either knew that the account had overdraft protection so that funds would be transferred

from the savings account.  Indeed, the record is devoid of any evidence that Mrs. Hudson had

any notion concerning Mr. Perkins's bank accounts:  she was not a joint owner of his bank

accounts, nor was she a payee-on-death beneficiary. [*See* Ex. 16; Ex. 34.]  Nor does the record

include any evidence that Mrs. Hudson knew that Plaintiff was a payee-on-death beneficiary of

the savings account.  Plaintiff argues that "[t]he facts which supported a finding of undue

influence also support a finding of fraud on the part of [Defendants, who] intentionally concealed

the transfers and the execution of a new will from [Plaintiff] and she relied upon their silence to

her detriment." [Doc. 53 at 10.]  The only record evidence of such, however, is Plaintiff's own

self-serving testimony, much of which is based on assumptions and not personal knowledge.  For

these reasons, the Court finds that Plaintiff has not satisfied the necessary elements to support a

determination of nondischargeability under § 523(a)(2)(A).

### C. Nondischargeability under § 523(a)(4)

A determination of nondischargeability under § 523(a)(4) requires a showing that the

debt was incurred by embezzlement, larceny, or fraud or defalcation while acting in a fiduciary

capacity.  Under this subsection, Plaintiff seeks a finding that Defendants embezzled from Mr.

Perkins by using his checking account, that they committed larceny against Mr. Perkins's estate

by removing property after he passed away, and that "the title of the Chevy Blazer was

transferred to [Mrs.] Hudson by the fraud or defalcation of [Mr.] Hudson, while acting under his

authority as Attorney-in-Fact." [Doc. 1 at ¶ 36.]

The Sixth Circuit defines embezzlement as "the fraudulent appropriation of property by a

person to whom such property has been entrusted or into whose hands it has lawfully come."

*Brady v. McAllister* (*In re Brady*), 101 F.3d 1165, 1172-73 (6th Cir. 1996).  "A creditor proves

embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated

the property for use other than for which it was entrusted, and the circumstances indicate fraud."

*Id*. at 1173.  On the other hand, larceny is "the fraudulent and wrongful taking and carrying away

of the property of another with intent to convert such property to the taker's use without the

consent of the owner." *The Strait & Lamp Grp. v. Moldovan* (*In re Moldovan*), 636 B.R. 491,

507 (Bankr. S.D. Ohio 2021) (citation omitted).  Larceny under § 523(a)(4) requires proof of

fraudulent intent; i.e., "'fraud in fact, involving moral turpitude or intentional wrong'" that can

be "established by circumstances demonstrating an intent to permanently deprive another of . . .

property." *RDLG, LLC v. Leonard* (*In re Leonard*), Adv. No. 13-5002, 2014 WL 1025823, at

*19 (Bankr. E.D. Tenn. Mar. 14, 2014) (citation omitted).  Larceny differs from embezzlement

because, for larceny, possession of the property was never lawful. *See First Nat'l Bank v.

Simerlein* (*In re Simerlein*), 497 B.R. 525, 537 (Bankr. E.D. Tenn. 2013).  Both embezzlement

and larceny under § 523(a)(4) require "an element of fraudulent intent" that "may be established

by an intent to permanently deprive another of his property." *Tucker v. Cross* (*In re Cross*), Adv.

No. 08-5029, 2009 WL 981900, at *4 (Bankr. E.D. Tenn. Apr. 13, 2009) (citations omitted).

Finally, defalcation while acting in a fiduciary capacity "encompasses not only embezzlement and misappropriation by a fiduciary, but also the failure to properly account for such funds." *Bd. of Trs. of the Ohio Carpenters' Pension Fund v. Bucci* (*In re Bucci*)*, 493 F.3d 635, 639 (6th Cir. 2007) (citation modified).  Under Sixth Circuit authority, defalcation by a fiduciary serves as the basis for a nondischargeable debt only if the plaintiff proves "(1) a pre-existing fiduciary relationship; (2) breach of that relationship; and (3) resulting loss." *Patel v. Shamrock Floorcovering Servs., Inc.* (*In re Patel*), 565 F.3d 963, 968 (6th Cir. 2009).

However, whether a fiduciary relationship exists is a question of federal law, *Commonwealth Land Title Co. v. Blaszak* (*In re Blaszak*), 397 F.3d 386, 390 (6th Cir. 2005), and in the Sixth Circuit, a fiduciary relationship is found only in "those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *R.E. Am., Inc. v. Garver* (*In re Garver*), 116 F.3d 176, 180 (6th Cir. 1997).[28] "To establish the existence of an express or technical trust, a creditor must demonstrate '(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.'" *In re Bucci*, 493 F.3d at 640 (quoting *In re Blaszak*, 397 F.3d at 391-92).

"A mere power of attorney may not be sufficient to establish the narrow fiduciary relationship contemplated by . . . § 523(a)(4) as interpreted by the Sixth Circuit." *Cameron v. Thomas* (*In re Thomas*), Adv. No. 13-1100, 2014 WL 509327, at *7 (E.D. Tenn. Feb. 7, 2014) (citations omitted); *see also Adamovic v. Lazarevic* (*In re Lazarevic*), Bankr. No. 11-10585, Adv. No. 11-1048, 2012 WL 4483901, at *19 (Bankr. E.D. Tenn. Sept. 27, 2012) ("Other courts in

---

[28] Based on this requirement, the Sixth Circuit has reiterated on many occasions that an "agent-principal relationship standing alone is insufficient to establish the type of fiduciary duty contemplated by § 523." *In re Blaszak*, 397 F.3d at 391.  Instead, § 523(a)(4) "applies to 'trustees who misappropriate funds held in trust, and not to those who failed to meet an obligation under a common law fiduciary relationship.' To except a debt from discharge under § 523(a)(4)'s defalcation provision, the creditor must establish the existence of a fiduciary relationship arising from the presence of an express or technical trust." *Simmons Cap. Advisors, Ltd. v. Bachinski* (*In re Bachinski*), 393 B.R. 522, 532 (Bankr. S.D. Ohio 2008) (quoting *In re Blaszak,* 397 F.3d at 391).

this Circuit have determined that evidence of a mere power of attorney between family members

is not sufficient to establish the narrow fiduciary relationship contemplated by 11 U.S.C. §

523(a)(4) as interpreted by the Sixth Circuit.").  This is because "[a]s a rule, the general fiduciary

duty created by a power of attorney gives rise to an agency relationship, but does not give rise to

the fiduciary capacity required by section 523(a)(4)." *Bast v. Johnson* (*In re Johnson*), 174 B.R.

537, 541 (Bankr. W.D. Mo. 1994).  Thus, "despite the fact that a durable power of attorney may

create a general fiduciary relationship under state law, this relationship will only rise to the level

required by § 523(a)(4) when the [power of attorney] establishes an express trust." *Bruinsma v.

Wigger* (*In re Wigger*), 595 B.R. 236, 257 (Bankr. W.D. Mich. 2018).

Defalcation necessarily "includes a culpable state of mind requirement akin to that which

accompanies application of the other terms in the same statutory phrase[; i.e.,] . . . one involving

knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary

behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269, 275 (2013); *see also Weiss v.

Fautz* (*In re Fautz*), 636 B.R. 553, 571 (Bankr. D. Mass. 2022) ("The meaning of defalcation has

at its core the misappropriation of money held in a fiduciary capacity and the failure to account

for any such monies. . . .  Provided there exists the necessary level or type of intent, risk, or

scienter . . . , defalcation encompasses any breach of fiduciary duty that results in a monetary

deficiency." (citations omitted)).  "[T]he scienter required for the three offenses described in §

523(a)(4) – fiduciary fraud and defalcation, embezzlement, and larceny – are 'akin,' or closely

related, to each other." *In re Piercy*, 2023 WL 2227563, at *6 (quoting *Peltier v. Van Loo

Fiduciary Servs., LLC* (*In re Peltier*), 643 B.R. 349, 360 (B.A.P. 9th Cir. 2022)).

For the same reasons that Plaintiff failed to establish the requisite fraudulent intent for

nondischargeability under § 523(a)(2)(A), she likewise has failed to do so for her claim under

subsection (a)(4).  In her brief, Plaintiff argues that Defendants embezzled money from Mr.

Perkins through their use of his bank account and debit card [*see* Doc. 53 at 11]; however, as

previously stated, the undisputed testimony of Mr. Hudson about the debit card's use, including

the eBay purchase of tires, was that Mr. Perkins insisted that Defendants use his debit card to

buy household items including groceries, tobacco, and gas, and a review of Mr. Perkins's debit

card entries as reflected in his bank statement indicate that the majority of items are for grocery

and convenience stores and food establishments.

Concerning the two $200.00 checks from Mr. Perkins's account to pay for Mr. Hudson's

storage unit that were handwritten and signed by Mr. Hudson, Plaintiff, who bears the burden,

presented no evidence about the checks except the checks themselves and Mr. Hudson's

testimony that they paid for his storage unit.  In contrast to the $28,900.00 check to Mrs. Hudson,

as well as the other checks in evidence, all of which were handwritten and signed by Mr. Perkins

personally, check numbers 3030 and 3037 were not. [*See* Stip. Facts at ¶¶ 13-16.]  Mr. Hudson,

however, was not asked whether he was authorized to use Mr. Perkins's funds to pay for the

storage unit, and Plaintiff presented no evidence that such use was unauthorized.  Simply, it was

not Defendants' burden to present any evidence about it, and the checks alone do not show

larceny, embezzlement, or breach of a fiduciary duty with the requisite intent.  *See McFeely Ltd.*

*P'ship v. Dilworth* (*In re Dilworth*), Adv. Proc. No. 18-03034 (AMN), 2022 WL 987044, at *24

(Bankr. D. Conn. Mar. 31, 2022) (stating that a "[d]ebtor does not need to prove his intention

was lawful [but the plaintiff] must prove his intention was wrongful").

Concerning her allegations that Defendants removed guns, tools, and equipment from Mr.

Perkins's house when they moved after Mr. Perkins died, thereby committing larceny against his

estate (and her, as residual beneficiary), Plaintiff offered mere speculation without actual

evidence.  She argued in her brief that the tools and equipment in the garage rightfully belonged

to Malcolm Perkins's heirs under the 2018 Will. [Doc. 53 at 12.]  Concerning the tools and

equipment that she states were taken from Mr. Perkins's garage, Plaintiff testified that she saw

tools and equipment in the garage in October 2020 and that she saw Defendants driving away

with "a truckload" when they moved out of the house in July 2022.  In support of her testimony,

Plaintiff presented a recording that she made on her phone during a walk-through, in the

presence of a notary, when Defendants were moving out.  On the recording, Plaintiff and Mr.

Hudson discussed keys to a gun safe, that items in a cabinet "were secure," and the guns were "in

a safe place."

Plaintiff testified that she can see Mr. Perkins's garage from her house, and she watched

Defendants pull away from the garage with things in their truck but conceded that she did not see

them take any individual items and did not inspect or see specifically what was in the truck.

Instead, she testified that she saw their truck backed up to the garage and pull away with a

"truckload" of items when, she surmised, they had not stored any of their belongings in the

garage, so they should not have been backed up to it.  Plaintiff also testified that she remembered

that Defendants had two storage sheds at Mr. Perkins's house. This testimony, however, is

insufficient to establish what items were in the garage when Defendants moved in and when they

moved out, when any such items were removed, and by whom they were removed.  That she saw

Defendants backed up to the garage and that their truck was full when they were moving from

Mr. Perkins's home does not prove that they took any items owned by Mr. Perkins, much less the

specific items that Plaintiff has claimed.  Further, Mr. Mitchell testified that he helped

Defendants move from the home and that the items they moved were their own, including a

television, clothes, a bed, and stuff that he had helped Mr. Hudson move into Mr. Perkins's

home.

     As for the audio recording of Mr. Hudson's statement that the guns were in a safe place,

he does not dispute that that he took possession of two guns owned by Mr. Perkins, as evidenced

by the Stipulations of Fact and his testimony that he does not own them but continued to have

them in his possession.  As for why he took the guns when he moved out in July 2022, Mr.

Hudson testified that Ms. Knight, who was moving into the house, had a young daughter, and he

removed them from the home to protect the child.  When asked by the Court at the end of trial

why he had not returned the guns, Mr. Hudson answered that he had not been asked by Plaintiff

to return them.  He also assured the Court that he had no intention of keeping the guns and was

prepared to turn them over.  Without evidence to the contrary by Plaintiff, the Court finds that

Plaintiff failed to meet her burden to show the fraudulent intent necessary for a finding of larceny

concerning the guns; however, any continued possession of the guns by Mr. Hudson or failure to

turn them over to Plaintiff after his admission that he was not the owner of them and would turn

them over falls under the definition of conversion as discussed below.

     Other than the recording, Plaintiff offered a list of items that she stated are missing, along

with photos that she took in the garage after Defendants moved out of the home in July 2022.

[Ex. 26; Ex. 27; Ex. 29.]  Her testimony and the exhibits, however, do not prove that Defendants

took any items from the home (except for the guns that the parties stipulated, which Mr. Hudson

acknowledged at trial that he still had in his possession).  Plaintiff testified that the list of items

was a summary typed from her handwritten notes that she created from memory after a Probate

Court hearing in 2023.  She, however, did not offer any evidence to support her claim that all of

the items were actually present in Mr. Perkins's garage before Defendants moved in, before

Defendants moved out, or that Defendants removed them from the premises.

Similarly, Plaintiff testified that she took the photographs on the day that Defendants

moved out of the home in July 2022, but she did not offer any photos of the garage before

Defendants moved out to prove that the listed items were present before they moved out and

missing after.  Further, on cross-examination, Plaintiff testified that everyone who needed to be

in the home had a key to it, although Mrs. Hudson testified that she had not known that they all

had keys to the house.  Finally, Defendants testified (without contradiction) that some of the

items Plaintiff alleged were missing were visible in Plaintiff's photographs.  In short, the list and

photos do not satisfy Plaintiff's burden to prove that the claimed tools and equipment were in the

garage when Defendants moved in with Mr. Perkins in April 2021 or that Defendants removed

any such tools and equipment either after they moved in or when they moved out in July 2022.

Finally, even if the Powers of Attorney were sufficient to create the kind of fiduciary

relationship required by § 523(a)(4), Plaintiff's argument that "the title of the Blazer was

transferred to [Mrs.] Hudson by the fraud or defalcation of [Mr.] Hudson, while acting under his

authority as Attorney-in-Fact" [Doc. 1 at ¶ 36], also fails.  Although Plaintiff testified that she

had never seen the Powers of Attorney before depositions in 2023, she did not dispute or rebut

Mrs. Hudson's testimony that she found the documents during the pendency of the Probate Case

and had never used them.  Concerning the Vehicle POA and Affidavit, which was completed by

Mr. Hudson and signed by Mr. Perkins and later Mrs. Hudson, Plaintiff observed that the

document was completed by Mr. Hudson, signed by Mr. Perkins, and listed the price as "gift."

Such facts, however, are not evidence of fraud or defalcation.  Even though Mr. Perkins and

Defendants had a familial relationship and they served as Mr. Perkins's primary caregivers,

Plaintiff did not establish fraud, as previously discussed, and cannot establish defalcation without the existence of a trust, of which she presented no evidence.

### D. Nondischargeability under § 523(a)(6)

Finally, Plaintiff argues that Mr. Hudson's taking possession of Mr. Perkins's guns after his death constituted a willful and malicious injury actionable under § 523(a)(6). To prevail under this subsection, Plaintiff must prove both (1) the existence of "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury[,]" *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998), and (2) that Defendants either desired to cause the consequences of their actions or believed with reasonable certainty that such consequences would occur. *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 464 (6th Cir. 1999). "That a reasonable debtor 'should have known' that his conduct risked injury to others is simply insufficient. Instead, the debtor must 'will or desire harm, or believe injury is substantially certain to occur as a result of his behavior.'" *Guthrie v. Kokenge* (*In re Kokenge*), 279 B.R. 541, 543 (Bankr. E.D. Tenn. 2002) (quoting *In re Markowitz*, 190 F.3d at 465 n.10). Furthermore, "the injury must invade the creditor's legal rights." *Musilli v. Droomers* (*In re Musilli*), 379 F. App'x 494, 498 (6th Cir. 2010) (citation omitted).[29]

Whether an injury is willful and malicious "is a two-pronged inquiry" that requires proof of both elements, and "in many cases, the same facts that support a finding of willful conduct under § 523(a)(6) will likewise support a finding that the debtor acted with malice"; however, in other cases, "a debtor may act willfully, but not maliciously." *MarketGraphics Research Grp.,*

---

[29] "The Sixth Circuit has developed a non-exclusive list of 'types of misconduct [that] satisfy the willful and malicious injury standard: intentional infliction of emotional distress, malicious prosecution, conversion, assault, false arrest, intentional libel, and deliberately vandalizing the creditor's premises.'" *In re Musilli*, 379 F. App'x at 498 (citations omitted).

*Inc. v. Berge* (*In re Berge*), 953 F.3d 907, 916 (6th Cir. 2020) (citations omitted).  "Lower courts

thus must analyze independently whether a debtor has willfully, and also maliciously, injured the

creditor before rendering a debt non-dischargeable in accordance with § 523(a)(6)." *Id.*

Willfulness is defined as "willful" as "voluntary," "intentional," and "deliberate," and the

actor must have intended not merely to act but to cause the consequences of the act. *Geiger*, 523

U.S. at 61-62 & n.3 (comparing willfulness to the proof required for an intentional tort).  To

measure willfulness, the Sixth Circuit "utilizes only a subjective standard, asking whether the

debtor himself was motivated by a desire to inflict injury." *In re Berge*, 953 F.3d at 915 (citing *In*

*re Markowitz*, 190 F.3d at 464).  Accordingly, "[a]n act will be deemed 'willful' only if it was

undertaken with the actual intent to cause injury," *Cash Am. Fin. Servs., Inc. v. Fox* (*In re Fox*),

370 B.R. 104, 119 (B.A.P. 6th Cir. 2007).  "Proof of willful behavior must often be demonstrated

through the use of circumstantial evidence that can 'be indirectly established by the creditor

demonstrating the existence of two facts:  (1) the debtor knew of the creditor's rights; and (2) the

debtor knew that his conduct would cause injury to those rights.'" *Jenkins v. Schmank* (*In re*

*Schmank*), 535 B.R. 243, 264 (Bankr. E.D. Tenn. 2015) (citation modified).

Maliciousness, on the other hand, is defined as "[being] in conscious disregard of one's

duties or without just cause or excuse; it does not require ill-will or specific intent to do harm.'"

*Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).  "Maliciousness is conduct targeted at

the creditor at least in the sense that the conduct is certain or almost certain to cause harm."

*Imsirovic v. Fitch* (*In re Fitch*), 666 B.R. 563, 575 (Bankr. S.D. Ohio 2025) (citation modified).

"A party may establish malice for purposes of § 523(a)(6) by showing 'that (1) the debtor has

committed a wrongful act, (2) the debtor undertook the act intentionally, (3) the act necessarily

causes injury, and (4) there is no just cause or excuse for the action.'" *Almasudi v. Ibrahim* (*In re Ibrahim*), 580 B.R. 218, 227 (Bankr. E.D. Tenn. 2017) (citations omitted).

Plaintiff argues that Defendants converted Mr. Perkins's property by taking the guns, tools, and equipment and using them for their own purposes.  Under Tennessee law, "[c]onversion is the appropriation of tangible property to a party's own use in exclusion or in defiance of the owner's rights." *Family Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284, 306 (Tenn. 2024) (citations omitted).  Unquestionably, actions of conversion "may serve as the basis for a determination of nondischargeability under § 523(a)(6)." *In re Ibrahim*, 580 B.R. at 226 (citation modified); *see also In re Musill*, 379 F. App'x at 498.  Nevertheless, "[m]ere proof of conversion is not sufficient to satisfy the requirements of § 523(a)(6)," without the requisite intent to cause injury. *In re Schmank*, 535 B.R. at 264.

As previously explained, Plaintiff did not prove that Defendants (or either of them) took without permission property belonging to Mr. Perkins or his estate, except for the two guns.  Mr. Hudson did not dispute that when they moved out in July 2022, he took two guns owned by Mr. Perkins that rightfully belong to his estate and should be turned over to Plaintiff.  Without deciding the question, the Court presumes that Mr. Hudson's taking of the guns meets the definition of conversion under Tennessee law; however, the Court finds Mr. Hudson's reason for taking the guns is plausible and that Plaintiff failed to prove the requisite intent to injure Mr. Perkins's estate that is required for a finding of nondischargeability under § 523(a)(6).[30]

---

[30] Nevertheless, if Mr. Hudson fails to turn over the guns to Plaintiff as he advised the Court that he would do, such continued possession *would* be intentional, willful, and malicious, so that Plaintiff would be authorized to ask the Court to alter or amend its finding based on Mr. Hudon's noncompliance and to award appropriate damages.

## II.  CONCLUSION

In summary, the Court finds that Plaintiff failed to meet her burden of proof on her claims under § 523(a)(2), (4), or (6).  An order consistent with this memorandum will be entered.

FILED:  November 19, 2025

<div style="margin-left:40%">

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE

</div>